the Hamburg when he was below pier No. 13, and when the Hamburg was four or five piers above her slip and that he then blew two whistles. He says, however, that he blew these whistles to an Erie tug which was backing out of a slip north of pier 14, with a barge lashed to her side, the stern of the tug projecting at the time only about 20 feet from the end of the slip. He testifies further that the tug immediately answered with two blasts and that the ferry-boat blew no signals at all. The tug was afterwards identified as the Buffalo but no one from her was called to corroborate this testimony and in view of the fact that the master of the Ivins, which was towing the mud scow, had already signaled the Buffalo with one blast it would seem a superfluous action on the part of the Berwind to signal a second time. In other words when the Buffalo answered the signal from the Ivins it was evident that she understood the situation and danger from her was averted if, indeed, the situation were such that she could at any time have backed across the course of the Berwind. The master of the Hamburg, corroborated by three of her crew and a passenger, testifies positively that he answered the Berwind's signal by two blasts. The clear weight of testimony, therefore, is that the signals were exchanged as the libelant contends. It is argued that if this agreement were made the Berwind would not have attempted to cross the Hamburg's bow. The answer is that if the agreement were not made the Hamburg would not have attempted to cross the Berwind's bow. The master of the Hamburg was an experienced navigator who thoroughly understood his business. The navigator of the Berwind, on the other hand, was an unlicensed deck hand, and we think it more probable that he misconceived the import of the signals than one who had been crossing the river between Hoboken and New York for nine years and who had an experience of fifteen years as pilot.

If the starboard hand rule had been superseded by a private convention suggested by the Berwind and assented to by the Hamburg no fault can be imputed to the latter in keeping on her course to her slip. She had agreed to do this and the Berwind had agreed to go under her stern. She knew that the ferry-boat was destined for the New York slip and under the agreement it was her duty to slow down and permit the ferry-boat to cross her bow. Her fault in this respect was the sole cause of the collision.

The decree is reversed and the cause is remanded to the District Court with instructions to decree in conformity with this opinion.

---

THE E. L. LEVY.

(Circuit Court of Appeals, Second Circuit. March 23, 1906.)

No. 127.

TOWAGE—INJURY OF TOW BY COLLISION WITH WRECK—NEGLIGENCE OF TUG.

A barge in tow of a tug was injured by striking a sunken wreck in midchannel of the Hudson river about dusk in the evening. There were two wrecks, one 1,600 feet above the other, and each marked by a buoy which had not at the time been lighted, but there was sufficient light when the

upper one was passed to see the buoy and the captain of the tug knew the location of both and could have avoided the lower one on which the barge struck by keeping further to the westward. *Held*, that he was in fault for not so doing, and that the tug was liable for the damages.

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon appeal from a decree of the district court, Southern District of New York holding the tug E. L. Levy liable for damages to the barge Sumner, which she had in tow and which collided with a sunken wreck in the Hudson river near Dow's Point just below Albany. The facts are rehearsed in the opinion of the district judge, reported in 108 Fed. 435.

J. Parker Kirlin, for appellant.
La Roy S. Gove, for appellee.

Before LACOMBE, and COXE, Circuit Judges.

PER CURIAM. We think the tug was rightly held in fault. Her navigators knew of the existence of the two sunken wrecks the Macdonald and the Sheffield, and knew their location, in mid-channel. However much the light may have faded by 10 minutes of 8 on the evening of May 19th, there was certainly enough left to disclose the presence of a buoy some little distance off. The tug was not in fault for starting when she did, nor is she chargeable because on that evening the wreck buoys were unlighted. Her navigators were entitled to assume that the lights would be there, until they found them extinguished. But the principal fault is that when it was found there was no light on the Macdonald, those in charge of the Levy did not at once take steps to bring their tow further to the westward. They passed near enough to the Macdonald to see that her buoy was unlighted (if they failed to notice that circumstance their lookout was insufficient), and were thus warned that they might expect to find the Sheffield wreck-buoy also unlighted. It was about 825 feet below the Macdonald and before reaching it there was ample opportunity to haul over to the westward. It is stipulated that the distance from the Sheffield to the westerly line of the channel was about 175 to 190 feet, a space sufficient to have brought the tow through in safety had the Levy acted more promptly. She made no effort however to haul over to the westward until within 150 or 200 feet of the Sheffield wreck-buoy, and for that neglect must be held liable.

The commissioner was apparently very liberal in his allowances for items of damage, although he rejected and reduced some of the libelant's claims. But the testimony was conflicting, he had all the witnesses before him, and the district court, after examination of the exceptions, sustained his findings. We do not find sufficient in the record to require a reversal on this branch of the case.

The decree is affirmed, with interest and costs.